## ROGERS *v.* SOGGS *et al.*

THE right to the use of growing wood and timber upon the public mineral lands, as between the claims of miners on the one hand and agriculturists on the other, is governed by the rule of priority of appropriation.

The possession of public land in the mineral districts of this State, acquired and held in accordance with the possessory act for agricultural purposes, carries with it the right to the wood and timber growing thereon, and this right is superior to that of subsequent locators of mining claims who need, and seek to use, the wood and timber for carrying on their mining operations.

In an action between occupants of the public lands neither party can claim a right to the growing timber thereon under the laws of the United States. The cutting or destruction of the timber by any occupant is expressly prohibited by Act of Congress of March 2d, 1831.

APPEAL from the Fourteenth Judicial District.

The Court below, to whom the case was submitted without a jury, found the facts as follows: "At the commencement of this action and for several years prior thereto, plaintiff was in possession of a tract of land or ranch on the public domain in Nevada County, containing about one hundred acres, which he used for agricultural purposes and held under the possessory act of this State, having all the titles thereto that can be acquired by virtue of a compliance with the provisions of said act. He resided on the

Rogers *v.* Soggs.

land with his family, and had erected thereon valuable improvements, consisting of buildings, orchards, vineyards, ornamental trees, etc., at an expense of about $8,000. Nearly one-fourth of the tract was under cultivation, the balance is in a wild state, and a portion is covered with oak and pine trees, enough in all, probably, to make five or six hundred cords of wood. The tract lies on the side of the hill which forms the north bank of Deer Creek— the creek being the southerly line—and a portion of the ground is very steep and rugged. Upon the lands immediately surrounding this tract the timber has nearly all been destroyed. On several parts of the ranch gold has been found and mining has been carried on, but in the particular portions on which the trees were cut by defendants it is not shown that there is or was any minerals. At or near the westerly boundary of this tract the defendants, who are miners, have a set of·quartz claims and a quartz mill, used in extracting the gold from the rock taken from said claims. The ledge upon which the claims are situated runs in the same general direction with the said westerly line of plaintiff's ranch. For the distance of two hundred feet, or thereabouts, from the creek, the surface or ' croppings ' of the ledge is in whole or in part within plaintiff's land—from thence it is without said line ; but the ledge dips or inclines towards and under plaintiff's land, at an angle of about forty-five degrees, and the point at which defendants are at work underground, by means of tunnels, is beneath a portion of the ranch. The mill of defendants stands very near the westerly line of the ranch, but entirely outside of it. In order to extract the gold from the quartz in a practicable and advantageous manner, it is necessary for defendants to have wood for the purpose of heating water to be used in the amalgamatory process, and for this purpose they cut the trees complained of. They were cut at a point on plaintiff's ranch about twelve hundred feet from the nearest point of the surface of defendants' claims. The trees cut were native forest trees, and were taken from that portion of the ranch which had never been in any manner cultivated or improved. Owing to the scarcity of timber in the vicinity, and the steepness and ruggedness of the ground which renders the mill difficult of access, defendants cannot obtain wood from any source in the imme-

diate neighborhood other than the land of plaintiff. But defendants *could* obtain wood by purchasing it from parties at some distance—of course at a greater cost. It is necessary for defendants to use about fifty cords of wood per year. I find that defendants cut on plaintiff's land as aforesaid twenty-eight trees, worth in the aggregate fifty dollars. In the mining district where these claims are, it is the custom with miners to locate quartz claims one hundred feet wide on the surface—fifty feet each way from the center of the ledge—but running with its dips and inclinations. Plaintiff claims that all the wood now on his ranch is not more than sufficient for his fire-wood and domestic purposes, and also that he had recently sold some wood to persons living in the neighborhood."

Judgment was rendered for defendants, and plaintiff appeals.

*John Garber*, for Appellant.

I. To justify an entry on lands held for agricultural and grazing purposes, the miner must show affirmatively that the *locus in quo*, the very ground entered upon, is mineral land. The ranchman who either incloses or complies with the possessory act has a good and indefeasible right and title, as of fee, against all the world, except where the land is mineral land, etc., then if none of plaintiff's tract contained mineral, the miners could enter on no part of it. If of his one hundred acres fifty only contain minerals, on that fifty alone can the miner enter. This seems clear, because the statute and the law give the miner this right of entry only when and because it contains gold. If the land, or any part of it, contain no gold, there is no necessity or pretext for the entry.

The mere position of the lines of the plaintiff's survey can neither give or take away this right of entry, for there is no connection between the lines and the right of the miner. If he have the right, it is on other grounds and for other and more substantial reasons, for the purpose of extracting the mineral it contains, to prevent monopoly, etc. If I take up mineral land, I take it subject to this right of entry; if I take up non-mineral land, I take it absolutely; if I take up land partly mineral and partly not, I take it partly subject.

II. Defendants must be at least confined to the boundaries of

their claim. The law never contemplated that the miner who had located a small claim on one corner of a ranch could trespass over the whole ranch *ad libitum*, even if it all contained minerals. Such a privilege cannot be said to be in any sense necessary, nor its exercise *bona fide*.

In *Burdge* v. *Underwood* (6 Cal. 45) a case very like this was presented, the case of a miner attempting to dig a ditch through a ranch to his claims, outside the limits of the ranch. The ditch there was conceded to be necessary to the working of the claims; true, it could have been dug elsewhere at a greatly increased cost. Here the wood could be purchased at a slightly increased cost, viz.: seventy-five dollars per annum. It was held a trespass. If that case was decided upon the ground that the claims were not on the ranch, it is authority for us; because here the mill was also outside our lines, and because, as we have endeavored to show, if the miner can go outside of his claim the limits of the ranch will not stop his encroachment.

III. The evils to be prevented by the policy of the law giving the right of entry to miners, will none of them be entailed by the decision we ask in this case. From such a ruling no monopoly can arise. The full, free, and beneficial working of the mines will still be easy and practicable. On the other hand, to sustain defendants' pretensions would lead to consequences the most ruinous and absurd.

This Court has settled that the farmer will be protected in all cases, except where an invasion of his rights is necessary and indispensable. What is the meaning of these terms in this connection? We can see plainly that in *Clark* v. *Duval* the building of the reservoir and the use of the water were necessary and indispensable; that without them the right to mine or enter would be a barren right. But is this so as to timber in any case? Would defendants' right to their ledge be worthless without the right to this timber? In *Smith* v. *Doe* the Court say, the use must be reasonable, and with just respect to the farmer's rights. What does this limitation signify? Simply that those privileges, and those only, must be allowed to the miner, without which he could not mine beneficially and to advantage—those which are necessary and indispensable. The same rule which has always been applied

in cases of a license or reservation.    (Collier on Mines, 58 *et seq.*;
*Darcy* v. *Arkwith,* Hobert, 234; *Cardigan* v. *Armitage,* 2 B. &
Cress. 197 ; *Broadbeat* v. *Wilkes,* Willis, 35.)

*Searls* and *Niles,* for Respondents, referred to the opinion of the
District Judge filed in the Court below, as showing sufficient rea-
sons for sustaining his judgment.    The following is a copy of that
opinion :

" The question of law to be decided is, had defendants, by virtue
of their ownership of their mining claims and as incident thereto,
the right to cut wood on plaintiff's ranch, outside of the surface
limits of their claim, sufficient to carry on and complete their min-
ing process ?    The question is an important one ; for although each
case of this nature must be determined, in a great measure, upon
its own particular facts, still the decision of this cause must involve
principles applicable to a large class of mining cases yet to be
determined.    Plaintiff contends that although the miner may enter
upon mineral land held for agricultural purposes, he can only use
that portion of it which actually contains mineral.    This position
is, I think, incorrect.    Whatever rights a miner has in the land
adjoining his claim does not depend upon the composition of the
soil in such land.    If, for instance, in order to work his claim, it
be necessary to build a reservoir at some distance from his lines, he
has the undoubted right so to do, whether the ground selected for
his reservoir contain gold or not.    This was expressly decided in
*Clark* v. *Duval* (15 Cal.) and in *Burdge* v. *Underwood* (6 Id.)
where miners dug a ditch through a ranch a mile distant from their
claims—and where but a small portion of the ranch was shown to
contain gold—the decision would evidently have been for the miners
had not the ditch interfered with land held for other than agricul-
tural purposes.    The miner, therefore, undoubtedly has *some* rights
on the public land adjoining his claim whether such land contains
gold or not; and the question is, has he the right to take wood
from such land sufficient to carry on his mining operations ?    The
Supreme Court of this State has not decided this exact question,
but I think it has established the principle upon which it should be·
determined.    An examination of all the cases, from *Hicks* v. *Bell*

down, shows that in every instance where the rights of the miner have come into conflict with those of the agriculturist, holding simply as such and not by virtue of valuable improvements, the latter have been held almost entirely subordinate to the former.   The theory of all the cases is, that the mineral region of California has, by both the General and State Governments, been exempted from location for agricultural purposes, *as against miners*.   In *McClintock* v. *Bryden* the Court says, that the General Government reserves the mines from the operation of preëmption laws and refuses to grant patents therefor; that the plaintiff in that case had acquired no right from the General Government, and that the State Government in declaring what lands may be possessed for agricultural and grazing purposes expressly excepts lands containing precious metals.   The possessory act of this State provides that miners may work mining land located for agricultural purposes ' as freely and unreservedly' as if no such location had been made.   All *other* occupants of the public mineral land stand upon equal footing and the first appropriation takes; but this rule does not obtain with respect to the agriculturist—he takes in subordination to the miner. He cannot prevent the miner from working ' freely and unreservedly,' except that the latter cannot destroy valuable and permanent improvements.   In *Fitzgerald* v. *Urton* (5 Cal.) the Court uses this language: ' The occupant may rely upon his possession as against a mere trespasser, and the fact that the land is upon the public domain or contains precious metals, will afford no authority to third persons entering upon his possessions, except in the cases allowed by the statute.   These cases are: 1st, when the land is used for grazing; 2d, for agricultural purposes.'   These and numerous other cases establish the absolute and unconditional right of a citizen to mine on any portion of the public mineral region, whether located for agricultural purposes or not.   And it must be remembered that plaintiff claims entirely under his *location* for agricultural purposes—not by virtue of permanent improvements or upon the ground that he occupies the premises for any other purposes than those mentioned in the statute under which he holds. What then does the ' right to mine ' include ?   Certainly not the mere privilege of digging within the narrow boundaries prescribed

by local custom as the limits of mining claims. These local customs designating the size of claims are intended simply to limit miners *as against other miners,* not as against the agriculturist. And the right is not simply to dig, but to *mine,* and to use all the elements or products of the land necessary to conduct and complete the mining process. In the case of *Tartar* v. *The Spring Creek Co.* (5 Cal.) a company of miners sought to take water away from the owners of a saw mill who were the prior appropriators. The Court decided that this could not be done—the owners of the saw mill occupying an entirely different position from that of an agriculturist—but uses this language : ' The appellants insist that as the State has granted the franchise of digging gold, all of the incidents necessary to that purpose—wood, water, etc.—must follow. This is certainly the doctrine of the Common Law, and would be held decisive of this case in the absence of any other right to contradict it. But in previous decisions we have shown that there is nothing sufficiently expressive in the character of that legislation to warrant an interference with the already acquired rights of individuals, *except in the single case of agricultural lands.*' In *Clark* v. *Duval* (15 Cal.) plaintiff held land for agricultural purposes, both under the possessory act and by actual inclosure. Defendants entered upon the land to mine ; located claims on one part of it, and constructed reservoirs, ditches, and flumes on other portions of it. In delivering its opinion the Court says : ' In giving effect to the policy of the Legislature we must hold, that the miner is not confined to a mere right of entry and egress, and a right to dig the soil for gold. Whatever is indispensable to the exercise of the privilege must be allowed him, else it would be a barren right subserving no end. But the substantial thing is a right to use the land upon which he goes, not merely to dig but to mine—and so to use the land and such elements of the freehold or inheritance, of which water is one, as to secure the benefits which were designed.' It will be noticed that in these cases the miners used land outside of the limits of their mining claims, and that all the land so used was not shown to be actually gold-bearing soil. In fact, without deciding that all the land in a gold-bearing district must be considered mineral land, it is not going too far, I think, to say that all of

Rogers *v.* Soggs.

a small tract of an hundred acres *should* be classed as mineral land within the meaning of the decisions when, as in the case at bar, gold has been discovered and mining carried on upon several different parts of the tract. It appears, also, from these decisions, that wood is one of the elements of the land that may be used by the miner. It is contended, however, that under the rule in *Clark* v. *Duval*, only those elements of the soil which are absolutely necessary to the process of mining can be taken by the miner; that in the case at bar the wood on plaintiff's land was not necessary because defendants *might* have obtained wood, by purchase, from other sources; and that in as large a business as that of defendants—in which they have from $100,000 to $200,000 employed—the difference of cost between fifty cords of wood cut on plaintiff's land and the same amount purchased from third parties, is too trivial a matter to be called a necessity. But this is too narrow a view of the necessity contemplated in that decision. The necessity is, not that *the wood* growing on plaintiff's ranch is indispensable to the working of defendants' claims, but that wood from some source is necessary; and wood being necessary defendants may take it from plaintiff's land. It must be remembered that the right of the miner is not a mere special privilege or easement, in the land of another, circumscribed and overshadowed by the superior title of the agriculturist; it is an original, independent, and superior right, paramount to that of the agriculturist, and subject to which the latter locates. In determining, therefore, what incidents follow this right, we must give to the language of the Courts used in reference to the subject, not a strict but a liberal construction. I think that in the case at bar, the right to take wood, as exercised by defendants, belonged to them by virtue of their ownership of their said mining claims and as incident thereto. From the foregoing views it follows, as a final conclusion of law, that defendants had the right to do the things complained of in the complaint, and that they have the right to cut and take away from the said land of plaintiff sufficient of the native forest trees growing thereon to carry on their said mining process as aforesaid, provided that in so doing they may not injure, destroy, or interfere with any of the valuable and permanent improvements of plaintiff."

CROCKER, J. delivered the opinion of the Court—COPE, C. J. concurring.

This is an action to recover damages for cutting timber on plaintiff's land, and for an injunction against any future acts of the same kind. It appears that for several years prior and up to the commencement of this action, the plaintiff was in the possession of a tract of about one hundred acres of public land in one of the mineral districts, which he held under the possessory act of this State, the provisions of which he had fully complied with. He resided on the land with his family, and had put thereon valuable improvements, consisting of buildings, orchards, vineyards, ornamental trees, etc., at an expense of about $8,000. A portion of the tract was under cultivation, and the remainder in its wild state, a portion of the latter being covered with oak and pine trees. At several places on the ranch gold had been found and mining carried on, but not on those portions where the timber in controversy was cut. The defendants are miners, owning and working quartz claims. About two hundred feet of their quartz ledge is on plaintiff's land, near the boundary line, and the ledge dips under plaintiff's land at an angle of about forty-five degrees. The defendants also own and work a quartz mill, for the crushing of the rock from their claims, which is located near plaintiff's land. The defendants are compelled to use wood to heat the water used in the amalgamatory process, in their mill, and they cut wood upon the plaintiff's land, about twelve hundred feet from the claims, for this purpose, which constitutes the trespass complained of. Upon this state of facts the Court below rendered judgment for the defendants, from which the plaintiff appeals.

Under the laws of this State, any citizen of the United States may enter upon and hold an amount of the public domain, whether within the mineral districts or not, or whether containing mines or not, not exceeding one hundred and sixty acres. He has the right to occupy and improve it, cultivate the soil, plant orchards and vineyards, and apply it to such uses as he may deem most advantageous to himself. But his possession of the land for the common usual purposes of grazing and agriculture, is subordinate to the right of the miner, who, when acting in good faith, has the right to

enter upon any tract of land held by another merely for agricultural or grazing purposes, and to mine the same, doing no more injury to the premises than may be necessary to enable him to work the mine in the most practicable manner.

The policy of this State is " to permit settlers in all capacities to occupy the public lands, and by such occupation to acquire the right of undisturbed enjoyment against all the world but the true owner." (*Tartar* v. *The Spring Creek Water and Mining Co.*, 5 Cal. 395.) This right of possession is exclusive of all others, except the miner, who has the right to enter upon any tract of mineral land which may be occupied by another merely for agricultural or grazing purposes, and to locate his mining claim thereon, according to the usage and custom of miners—to pass and repass over the land in going to and from his claim; to dig up the soil, sink shafts, run tunnels, and do all other acts necessary and proper to enable him to work his claim efficiently, being careful to do no unnecessary injury to the land.

Such, in general terms, are the rights of the miner; but these rights are subject to limitations and restrictions, necessary to prevent an interference with rights of property vested in others, and which are entitled to equal protection with his own. Thus he has no right to use water to work his mine which has been appropriated to other legitimate purposes. (*Irwin* v. *Phillips*, 5 Cal. 140; *Tartar* v. *The Spring Creek Water and Mining Comyany*, Id. 395.) Nor has he a right to dig a ditch to convey water to his mine over land in the possession of another. (*Burdge* v. *Underwood*, 6 Cal. 45; *Weimer* v. *Lowry*, 11 Id. 104.) Nor can he mine land used for a residence and for purposes connected therewith. (*Fitzgerald* v. *Urton*, 5 Id. 308.) Or land used for houses, orchards, vineyards, gardens, and the like. (*Smith* v. *Doe*, 15 Id. 101; *Gillan* v. *Hutchinson*, 16 Id. 153.)

In *Smith* v. *Doe* (15 Cal. 101) the Court say: " It must not be understood, however, that within the limits of the mines all possessory rights and all rights of property, not founded upon a valid legal title, are held at the mercy and discretion of the miner. Upon this subject it is impossible to lay down any general rule, but every case must be determined upon its own particular facts. Valuable

Rogers *v.* Soggs.

and permanent improvements, such as houses, orchards, vineyards, etc., should undoubtedly be protected; as also growing crops of every description, for these are as useful and necessary as the gold produced by the working of the mines. Improvements of this character, and such products of the soil as are the fruits of toil and labor, must be regarded as private property, and upon every principle of legal justice are entitled to the protection of the Courts."

As was said in the case of *Tartar* v. *The Spring Creek Water and Mining Company*, "the legislation and decisions have been uniform in awarding the right of peaceable enjoyment to the first occupant, either of the land or of anything incident to the land." In that case, as also the case of *Clark* v. *Duval* (15 Cal. 85), the Court recognize the common law principle that the grant of the right to mine carried with it all the incidents necessary to that purpose ; that this included the use of the land and such elements of the freehold and inheritance, as wood, water, and the like, as were necessary for mining purposes. But in the former case the Court expressly says that "there is nothing sufficiently expressive in the legislation of the State which warrants an interference with the already acquired rights of individuals, except in the single case of agricultural lands. So in *Stokes* v. *Barrett* (5 Cal. 36) the Court say, that "to authorize an invasion of private property, in order to enjoy a public franchise, would require more specific legislation than any yet resorted to." And in *Gillan* v. *Hutchinson* (16 Id. 153) it was held that the Legislature had no power to take the property of one person and give it to another, and therefore the Act of 1855, giving the miner the right to dig up an orchard, vineyard, garden, and crop of growing grain by tendering the owner a bond for the payment of all damages, was held invalid.

Such are some of the principles which this Court has laid down in determining the numerous questions which have arisen between the occupant of the public lands and the miner. While the rights of the latter have been sedulously guarded, the Court have been equally careful to protect the rights of the former from invasion. The question now before us has never yet been determined by this Court, but it is to be adjudicated in accordance with those fundamental principles regulating the rights of property, by which one

person is not permitted to take and hold that which belongs to another.  The rule that priority of appropriation gives priority of right, must determine this as it has numerous other cases of the same class.  The plaintiff in this case, by his prior occupation, acquired the right to the peaceable enjoyment of the land, which includes the trees growing thereon.  The defendants, in locating their mining claims, took it subject to the prior vested rights of the plaintiff.  They took them subject to the rule of property laid down in *Irwin* v. *Phillips* (5 Cal. 140) : " The miner who selects a piece of ground to work must take it as he finds it, subject to prior rights, which have an equal equity on account of an equal recognition from the sovereign power.  If it is upon a stream, the waters of which have not been taken from their bed, they cannot be taken to his prejudice ; but if they have already been diverted, and for as high and legitimate a purpose as the one he seeks to accomplish, he has no right to complain—no right to interfere with the prior occupation of his neighbor, and must abide the disadvantages of his own selection."  The right of the plaintiff to cut and use the timber growing on the land for his own domestic purposes, is as high, if not higher, than that of the defendants to use it for mining purposes.  If the defendants have located in a place where wood is difficult to procure, or where wood lands are held and occupied by others, that is one of the disadvantages of their selection from which the Courts cannot relieve them.

The defendants can claim no right to the timber under the laws of the United States.  The Act of Congress of March 2d, 1831, prohibits all persons from cutting, destroying, or removing timber on any of the lands of the United States, except for the use of the navy, and prescribes a fine of not less than triple the value of the trees or timber so cut, destroyed, or removed, and imprisonment not exceeding twelve months, as a punishment for those who violate the provisions of the law.  And, in the case of *Cotton* v. *The United States* (11 How. U. S. 229), it was held, that the United States have the right to bring an action of trespass against a person for cutting and carrying away trees from the public lands.  The public mineral lands of this State belong to the National Government, which has the full power of disposing of the land and the timber

growing thereon in such manner as it may deem proper.    Congress, in the exercise of this power, has authorized the settlement and occupation of the public lands, but has expressly prohibited the cutting or destruction of the timber growing thereon.    The defendants cannot, therefore, claim that the laws of the United States protect them in their acts.    They were, in our judgment, trespassers in cutting and carrying away the trees growing on the land.

The judgment is reversed, and the Court below is directed to enter a judgment in accordance with this opinion.